[Cite as *In re M.B.*, 2026-Ohio-3009.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: M.B.

C.A. No.     31728

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 25 03 0136

DECISION AND JOURNAL ENTRY

Dated: August 5, 2026

SUTTON, Judge.

**{¶1}** Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that adjudicated her child dependent. This Court affirms.

I.

**{¶2}** Mother is the biological mother of M.B., born February 19, 2013. The child's father did not appeal.

**{¶3}** In late February 2025, Summit County Children Services Board ("CSB" or "the agency") received a report that Mother had hit M.B. with a broom on February 3, leaving bruises on the child's neck, back, and arm. The police removed the child from Mother's home pursuant to Juv.R. 6, and the agency placed her with her adult sister T.J. The next day, CSB held a team decision meeting, during which Mother agreed to an out-of-home safety plan whereby Mother would retain legal custody while M.B. stayed in T.J.'s home. Two weeks later, however, after a home visit to Mother's home, coupled with some actions by Mother that indicated the safety plan

was no longer viable, CSB filed a complaint alleging that M.B. was an abused and dependent child. The agency obtained an emergency order of temporary custody and maintained the child in her placement with T.J. The next day, CSB filed an amended complaint, emphasizing its concerns that Mother's mental health, alcohol use, and physical health impaired her ability to provide an appropriate home environment for the child.

{¶4} After an adjudicatory hearing, the magistrate found M.B. dependent under R.C. 2151.04(C) based on evidence that the conditions and environment in Mother's home were adverse to the child's normal development. Specifically, the magistrate found that Mother's mental health challenges, excessive use of alcohol, and verbal mistreatment of the child seriously disrupted the parent-child relationship and caused M.B. great fear and anxiety at the prospect of returning home. The magistrate dismissed the remaining allegations of dependency and abuse for lack of evidence.

{¶5} Mother objected to the magistrate's decision on evidentiary grounds. CSB responded in opposition. The juvenile court overruled Mother's objection and adjudicated M.B. a dependent child under R.C. 2151.04(C). The trial court based its judgment on findings relevant to the impact of Mother's mental health issues and excessive alcohol use on the child's well-being. In addition, the juvenile court found that vermin and clutter in the home, Mother's criminal history, and the child's fearfulness of Mother warranted the state, in the interests of the child, in assuming her guardianship.

{¶6} After the juvenile court placed M.B. in CSB's temporary custody after the initial dispositional hearing, Mother timely appealed the child's adjudication. She raises two assignments of error for consideration. This Court consolidates Mother's assignments of error because, although they implicate distinct legal concepts, they require a review of the same evidence. *See In re J.D.*, 2025-Ohio-5116, ¶ 12 (9th Dist.).

II.

**ASSIGNMENT OF ERROR I**

THE DEPENDENCY ADJUDICATION FINDING UNDER R.C. 2151.04(C) WAS SUPPORTED BY INSUFFICIENT EVIDENCE.

**ASSIGNMENT OF ERROR II**

THE DEPENDENCY ADJUDICATION FINDING UNDER R.C. 2151.04(C) WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED.

{¶7} Mother argues that the juvenile court's judgment adjudicating M.B. a dependent child is not supported by sufficient evidence and is against the manifest weight of the evidence. This Court disagrees.

{¶8} A child welfare agency initiates a juvenile dependency, neglect, and/or abuse case by filing a complaint in the juvenile court. *See* Juv.R. 22(A); Juv.R. 10; R.C. 2151.27(A). The complaint is "the legal document that sets forth the allegations that form the basis for juvenile court jurisdiction." Juv.R. 2(H). The juvenile court must base its adjudication on the evidence adduced at the adjudicatory hearing to support the allegations in the complaint. *See In re Hunt*, 46 Ohio St.2d 378, 380 (1976). If the agency fails to prove the allegations in the complaint by clear and convincing evidence at the adjudicatory hearing, the juvenile court must dismiss the complaint. Juv.R. 29(F)(1); R.C. 2151.35(A)(1). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶9} This Court's review under the sufficiency of the evidence standard requires us to "examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *In re Z.C.*, 2023-Ohio-4703, ¶ 12. From the adjudicatory

hearing evidence, the juvenile court was required to determine that CSB established the child's dependency by clear and convincing evidence. *In re H.P.*, 2022-Ohio-778, ¶ 28 (9th Dist.). *See also* R.C. 2151.35(A)(1); Juv.R.29 (E)(4).

{¶10} This Court reviews a manifest weight challenge to an adjudicatory finding as follows:

> In determining whether the juvenile court's adjudication of dependency is against the manifest weight of the evidence, this court [reviews] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [adjudication] must be reversed[.]

(Alterations sic.) *In re R.L.*, 2017-Ohio-4271, ¶ 8 (9th Dist.), quoting *In re C.S.*, 2012-Ohio-2884, ¶ 5 (9th Dist.), quoting *In re A.W.*, 2011-Ohio-4490, ¶ 8 (9th Dist.).

{¶11} The juvenile court adjudicated M.B. dependent under R.C. 2151.04(C), which defines a dependent child as one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]"  This Court recognizes that

> [a] dependency finding under R.C. 2151.04(C) does not require specific parental fault; rather the focus is on the child's situation to determine whether the child is without proper or adequate care or support. The conduct of the parent is relevant only insofar as it forms a part of the child[ ]'s environment and it is significant only if it has a detrimental impact on [her].

(Internal citations and quotations omitted.) *In re A.S.*, 2020-Ohio-1356, ¶ 10 (9th Dist.), quoting *In re I.T.*, 2016-Ohio-555, ¶ 32 (9th Dist.).  To establish dependency under Subsection (C), CSB "was required to present evidence of conditions or environmental elements that were adverse to the normal development of the child[ ]." *In re J.D.*, 2025-Ohio-5116, at ¶ 15 (9th Dist.), quoting *In re A.C.*, 2004-Ohio-3248, ¶ 14 (9th Dist.), citing *In re Burrell*, 58 Ohio St.2d 37, 39 (1979).

{¶12} In its complaint, CSB alleged the following.  Mother hit the child with a broom on February 3, 2025, leaving bruises on various parts of her body.  The child reported that Mother

frequently hits her, threatens to hurt her, and calls her abusive and profane names. She added that Mother drinks to the point of blacking out. M.B. said that she does not feel safe with Mother and does not want to live in her home. Mother also has mental health and physical health issues. Her physical health conditions are significant enough to require frequent, and sometimes lengthy, hospitalizations. M.B. typically stays with T.J. during those times.

{¶13} Continuing allegations were that the agency held a team decision meeting on February 28, 2025, during which Mother exhibited some concerning behaviors. She yelled, cried, called the child a liar, and accused T.J. and her boyfriend of being witches who put a spell on M.B. Ultimately, Mother agreed to the implementation of a safety plan whereby M.B. would stay with her adult sister T.J., her boyfriend, and their three young children. Within two weeks, however, Mother called CSB, crying and accusing T.J. of manipulating the child. Mother called the police and reported that M.B. had been kidnapped and taken to Georgia. The police conducted a welfare check and found everything to be fine in T.J.'s home.

{¶14} Additional allegations included that two days later, a social work assistant went to Mother's home to have Mother sign releases of information related to her mental and physical health, and her participation in Summit County HOPE Court ("HOPE"). While there, the worker observed mice and extreme clutter in the home. After inquiring about a noise upstairs, the worker reported that Mother claimed it was a ghost. Based on these various concerns, and Mother's lack of cooperation with the safety plan, CSB filed its complaint and obtained emergency temporary custody of the child.

{¶15} At the adjudicatory hearing, an officer from the Akron Police Department testified that he investigated a report of child abuse by Mother against M.B. He saw pictures taken three weeks earlier of bruises on various parts of the child's body. The officer spoke with M.B. who

reported being "very fearful" of what Mother would do if she went home and Mother knew she had contacted the police about being beaten on two occasions earlier in the month. The officer testified that M.B. appeared genuinely afraid, slumped on the couch with her arms crossed and speaking in a shaky voice. He emphasized that T.J. was not in the room when he questioned M.B. Based on the child's demeanor and photos of bruises on her body, the officer invoked Juv.R. 6 and removed M.B. from Mother's home.

{¶16} The agency worker who visited Mother's home days before CSB filed its complaint testified that Mother appeared a little confused and frustrated, and was "a little all over the place" when speaking. Mother referred to the child as being "out of town[,]" although CSB had placed M.B. with T.J. at that point under the safety plan. The worker testified that she was concerned by Mother's comment about a ghost in the home because Mother seemed sincere in her belief. Although she stayed only briefly in Mother's home, the worker observed one mouse in the kitchen and another in the living room. Mother admitted that there were mice in her house because of a field next door. In addition, the worker testified to a lot of clutter, both inside the home and on the front porch.

{¶17} T.J. testified that she has been concerned about M.B.'s living environment with Mother since she became aware of Mother's mistreatment and abuse of the child beginning in 2022. T.J. said that she contacted the police about her concerns on prior occasions. Although she never witnessed physical assaults by Mother against M.B., T.J. testified that she observed numerous verbal altercations between the two. She testified that Mother routinely berates the child. M.B. told T.J. that she is afraid of Mother and often feels unsafe at home. T.J. has picked up the child on multiple occasions after M.B. called to report being scared with Mother.

{¶18} T.J. testified that Mother drinks alcohol and is typically not sober whenever she sees her. After M.B. told her that Mother beat her on February 3 and 6, 2025, T.J. called Mother late on February 6 to ask if she could come over to talk. Mother agreed, as long as T.J. brought Corona beers and cigarettes. When T.J. arrived around midnight with the beer, she could tell by Mother's speech and demeanor that she had been drinking. T.J. also saw a large empty Corona beer container in the trashcan. Over the next seven hours, Mother finished the six-pack of beer and let T.J. take the child home with her.

{¶19} T.J. admitted that Mother's physical home is appropriate for the child. There are working utilities, appliances, furniture, clothing, and adequate food in the home. Nevertheless, she testified that she is concerned about the impact of Mother's mental health and drinking on M.B. T.J. testified that Mother is mean when drunk and berates the child to the point of tears, calling her fat and ugly. Mother told T.J. that M.B. is "bad and sneaky." T.J. further asserted that Mother accused her of being under a love spell placed by her boyfriend and his mother who are "witches and warlocks."

{¶20} T.J. testified that Mother is also overprotective, putting strict limits on the child's ability to leave the home. Mother admitted as much during her own testimony, saying that she does not let M.B. go outside by herself because children can disappear.

{¶21} The CSB intake worker who investigated the underlying concerns testified that she saw pictures of bruises on the child's body. Mother denied hitting the child and claimed that T.J. was manipulating the child and had used make up to fabricate the bruises. T.J. denied Mother's allegations.

{¶22} The intake caseworker testified that Mother's behavior was "all over the place" at the team decision meeting, which T.J. and M.B. also attended. Mother was argumentative with

T.J., crying on the phone with her counselor, and discussing sensitive and inappropriate topics in front of the child. For example, Mother accused M.B. of using make up to create the appearance of bruises, accused T.J. of being involved with witches and warlocks, and discussed her own sexual assault as a child. The caseworker had to remove M.B. from the room after she became overwhelmed and started crying.

{¶23} The caseworker described the circumstances evidencing Mother's failure to adhere to the safety plan. Mother accused T.J. of taking the child to Georgia to live. T.J. had planned a short trip to Georgia and got the agency's approval to leave M.B. with T.J.'s boyfriend's mother. Mother refused to believe that the child had remained in Ohio, despite the caseworker's assurances. After Mother called the police to report that M.B. had been kidnapped, the agency determined that the safety plan was no longer a viable or beneficial option for working with the family.

{¶24} CSB maintained the child's placement in T.J.'s home after filing its complaint. The agency assessed T.J.'s home and found it and the residents, including T.J.'s boyfriend, appropriate. Since M.B.'s placement with her sister, there have been no issues. The child has refused to visit with Mother throughout the agency's involvement, including the weeks before CSB filed its complaint.

{¶25} The caseworker testified that Mother was involved in mental health services and HOPE mental health court. Ms. E., the program coordinator of HOPE testified that it is a two-year mental health court program for people with "serious mental illness" who have committed felonies of the third, fourth, or fifth degrees. The program ensures that participants are engaging in mental health treatment; taking their medications as prescribed; and participating in counseling, case management, peer support services, and drug screening. Successful completion of the program requires one full year of both sobriety and full mental health compliance.

{¶26} Ms. E. testified that she supervises probationers in HOPE and was very familiar with Mother. She testified that Mother's significant medical issues, including heart and lung problems and frequent hospitalizations, prevented Mother from doing the "traditional" HOPE program. Accordingly, Mother was permitted to meet with the judge, her counselor, her psychiatrist, and Ms. E. virtually. Mother only saw her case manager in person.

{¶27} Ms. E. testified that Mother qualified for the mental health court program after receiving a qualifying diagnosis from Summit Psychological Associates. Mother was diagnosed with schizoaffective disorder, which the supervisor described as a mood disorder combined with psychosis. Ms. E. did not know if the psychiatrist had prescribed any medications for Mother. Mother testified that she took Lexapro briefly but that the psychiatrist took her off it because it made her "very aggressive and agitated."

{¶28} Ms. E. testified that she did not believe that Mother had substance use issues because her only related diagnosis was alcohol use "in remission." Because Mother participated virtually in most aspects of the program, there was a very limited opportunity for anyone to determine if Mother smelled of alcohol. Ms. E. testified that Mother was screened for drug and alcohol use during the year and maintained sobriety. However, Mother's lab results, relied upon by HOPE, were admitted as an exhibit and indicated that she tested positive twice for alcohol use. Ms. E. admitted that, based on Mother's physical health issues, the program generally only required Mother to submit to screenings every other week instead of the normal weekly screening requirement. Moreover, HOPE stopped screening Mother for alcohol use at all during her last six months in the program, focusing solely on amphetamine, cocaine, and opiate screens during that time. It was during that time that M.B. alleged Mother beat her, and the child and T.J. reported that Mother was drinking excessively.

{¶29}  The caseworker testified that Mother denied any current alcohol use, claiming that her medical conditions prohibit it.  Mother admitted that she had a severe problem with alcohol between the ages of 21 and 25 years old and drank Corona when she "used to be an alcoholic." She testified that she only drank socially during the next seven years.  Now, at the age of 41 years, Mother asserted that she never drinks beer anymore.  If she drinks at all, she has a cocktail. Mother's mother testified, however, that Mother drinks beer "every now and then[,]" but never "alcohol[.]"

{¶30}  The caseworker testified that, based on her experience, she has seen that alcohol use can impact ongoing mental health issues, and a parent's mental health can exacerbate substance use.  In addition to the child's reports that Mother was physically and verbally abusive to her, the caseworker testified that M.B. reported that Mother has told her repeatedly that if she leaves home or goes into foster care, people will sexually abuse or rape her.  In fact, Mother told the caseworker that T.J.'s boyfriend would sexually assault the child if she were placed in that home.  Mother did not allege that the boyfriend had ever acted inappropriately before, only that he "would" abuse M.B.  The caseworker testified that the agency had no concerns regarding the environment in T.J.'s home, including her boyfriend's residence there.  Moreover, Mother originally agreed to the child's placement in that home during the safety plan.

{¶31}  Mother herself had been sexually abused by her father at the age of eight years old, and maintained that she kept the child close at home to protect her from abduction and assault. She referred to M.B. as "my baby" and testified that the 12-year-old child "literally just stopped sleeping with me."  Mother denied that her admittedly overprotective parenting style negatively affected the relationship she had with the child.  T.J. and the caseworker, however, testified that,

in addition to Mother's physical and verbal mistreatment of the child, Mother's strict limitations added to M.B.'s distress.

{¶32} As an additional note, a review of the transcript indicates that Mother's testimony was often disjointed and unfocused. She returned repeatedly to claims that CSB had prevented her from being able to present evidence in her defense, specifically, (1) police bodycam footage of collusion between T.J. and the child in 2023, that showed T.J. coaching M.B. to lie about being physically abused by Mother; (2) the recording of the team decision meeting, despite the caseworker's testimony that those meetings are not recorded; and (3) the photos she saw during the team decision meeting that purported to show bruising on the child, which were "way lighter" and clearly evidenced make up, instead of the photos admitted at the hearing, showing much darker bruising. In addition, during the social work assistant's testimony that she referred Mother to the intake worker for answers to her questions about the agency's involvement, Mother blurted out in court, "I'm sober."

{¶33} In her ongoing testimony, Mother denied that the social work assistant ever saw mice in Mother's home, despite her testimony immediately prior that mice sometimes enter her home from the field next door. She admitted she told the worker that the only thing she would find upstairs making noise would be a ghost, although she claimed she was joking. As to reports of her repeated "witches and warlocks" comments, Mother testified that T.J. refers to herself as a witch.

{¶34} After a thorough review, this Court concludes that the record demonstrates that the evidence is legally sufficient to support a finding that M.B. is a dependent child under R.C. 2151.04(C). *See In re Z.C.*, 2023-Ohio-4703, at ¶ 13. In addition, there is nothing in the record to demonstrate that the juvenile court clearly lost its way and created a manifest miscarriage of

justice in finding the child dependent. *See In re R.L.*, 2017-Ohio-4271, at ¶ 8 (9th Dist.). The evidence established that M.B.'s living environment with Mother caused her great distress and fear. After her placement with T.J. during the safety plan and after CSB filed its complaint and obtained emergency temporary custody, M.B. has consistently refused to have contact with Mother. The police officer who investigated allegations of the child's abuse, T.J., and the caseworker all testified regarding the child's fearfulness of Mother. Whether due to Mother's behaviors stemming from mental health, substance use, or a combination of the two; or, as Mother alleges, M.B.'s and/or T.J.'s plot merely to give the child freedom to do as she pleases, the relationship between Mother and the child has become unhealthy to the point of requiring state intervention in the interests of the child. Mother does not recognize any rift or tension between the two. In the meantime, M.B. has made repeated claims to multiple people about Mother's physical and verbal abuse of her, and that she feels unsafe in Mother's home. Under these circumstances, the juvenile court did not err by adjudicating M.B. a dependent child under R.C. 2151.04(C). Mother's first and second assignments of error are overruled.

### III.

**{¶35}** Mother's two assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

 

BETTY SUTTON
FOR THE COURT

 

FLAGG LANZINGER, P. J.
STEVENSON, J.
CONCUR.

APPEARANCES:

JAMES K. REED, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and ASHLEE JAMES, Assistant Prosecuting Attorney, for Appellee.